UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ROBERT RANKOV,

                Plaintiff,                        NOT FOR PUBLICATION
                                                             **MEMORANDUM & ORDER**
    - against -                                        11-CV-02534 (CBA)

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                Defendant.
------------------------------------------------------------------x
AMON, Chief United States District Judge.

        Plaintiff Robert Rankov has petitioned for review of the Commissioner's denial of disability insurance benefits. The parties have cross-moved for judgment on the pleadings. Having reviewed the Administrative Law Judge's ruling, the record, and the parties' submissions, the Court vacates the Commissioner's decision and remands for further administrative proceedings pursuant to 42 U.S.C. § 405(g).

## BACKGROUND

        Rankov has made clear that he is alleging only a disability based on non-exertional mental impairments (Tr. 44-45; Pl. Mem. at 4, 6 n.5). The Court thus focuses principally on the aspects of the record addressing those impairments.

**I. Non-Medical Evidence**

        Rankov was born in 1972, and completed the twelfth grade. (Tr. 40, 42.) He worked at Verizon as a telephone technician installing and repairing telephone lines from March 1998 through March 2008. (Tr. 44, 178.) Prior to that position, he was a supervisor at a janitorial company. (Tr. 49, 178.) In 2003 and 2004, in addition to working for Verizon, Rankov also supervised employees at two construction companies that he owned. (Tr. 45-46.) When he

applied for benefits on January 29, 2009, Rankov alleged that he had become disabled on March 27, 2008, due to depression, emotional instability, suicidal thoughts, high blood pressure, and weight gain. (Tr. 177.)

In a disability report submitted with his application, Rankov stated that he began treatment with Dr. Dushan Kosovich in August 2007, who prescribed Cymbalta and Wellbutrin, as well as Crestor to lower his cholesterol. (Tr. 180-81.) Rankov reported that his mental impairments caused lack of concentration and interest in basic daily activities. (Tr. 177.) His emotional instability and mood swings led to family arguments. (Id.) He had suicidal thoughts. (Id.) High blood pressure caused dizziness and headaches, and he had constant chest pressure and dull pain. (Id.) Rankov stated that in April 2008, he took a buy-out package offered by Verizon and left his job there. (Tr. 178.) He tried construction work after that but was unable to function because he "could not deal with customers or work duties" and quit after a few days. (Tr. 52, 178.)

In a function report completed on February 19, 2009, Rankov indicated that he had no problems with personal care, but sometimes did not shave or shower for a few days until his wife reminded him. (Tr. 222-23.) He usually stayed in his room and watched television. (Tr. 222.) His wife always prepared his food. (Tr. 223.) He stated that he did not do work around the house or yard due to a lack of motivation. (Tr. 224.) He was able to go out alone, and got around by walking, driving, or riding in a car. (Id.) He shopped for groceries once or twice per week. (Tr. 225.) He reported problems getting along with people, including those in authority, because he was selfish, did not pay attention, and got upset quickly, though he had not lost any jobs as a result of these issues. (Tr. 226-28.) Rankov stated that he needed to be alone all the time. (Tr. 226.) He could not concentrate or pay attention and did not "understand the point"

when people told him things. (Tr. 227.) He was able to finish what he started and could follow spoken and written instructions. (Id.) Stress or changes in schedule upset him, and he had trouble remembering things. (Id.)

In a March 15, 2009 function report, Rankov stated that he could not "do anything for longer than a few minutes" and that he "forg[ot] lots of things." (Tr. 203.) He stated that he did not prepare his own meals because he did not "have interest to cook," and that he sometimes needed reminders to take his medication. (Tr. 204.) If a task took too long, he got frustrated and could not finish it. (Tr. 208.) He was able to pay bills, count change, and handle his checking and savings account, although he stated that he felt "a little slower" when dealing with money. (Tr. 206.) When he was under stress, he got headaches, ranging from "dull" to "stabbing." (Tr. 209-10.) From two to twelve times per month, he had pain in his head, forehead, and back. (Tr. 210-11.) When he experienced this pain, he had to lie down for thirty minutes to one hour and took Tylenol and Aleve, which sometimes alleviated the pain. (Tr. 211.)

At his administrative hearing held on July 6, 2010, Rankov testified that he could not work because he experienced panic attacks, which involved sudden chest pain and headaches. (Tr. 51.) He could not finish things that he started because he could not concentrate. (Tr. 51, 72.) He stated that he saw Dr. Kosovich, a psychiatrist, every two to three months beginning in 2007. (Tr. 52-53.) Dr. Kosovich prescribed Cymbalta, Wellbutrin, Crestor and Monopril. (Tr. 53-54.) Rankov stated that the medications sometimes helped his symptoms but also made him tired. (Tr. 54-56, 72.) He indicated in addition that he could not see Dr. Kosovich for more frequent therapy because he could not afford it. (Tr. 72-73.) He had never gone to the emergency room or been hospitalized for any mental problems. (Tr. 54.) He stated that he had a lack of drive and felt down all the time. (Tr. 55.) He had some problems sleeping; he would

awake in a nervous state and not be able to fall back to sleep. (Tr. 73-74.) Rankov testified that he was currently five feet and ten inches tall and weighed 225-30 pounds; in 2006 or 2007, he had weighed 180 to 185 pounds. (Tr. 41.) He was unsure of the reason for his weight gain. (Id.)

Rankov testified that he lived with his wife and two daughters in an apartment. (Tr. 41-42.) He had a driver's license but did not own a car. (Tr. 42.) He took care of his personal needs "most of the time." (Tr. 57-58.) He stayed in bed and in his room by himself most of the day. (Tr. 54.) He stated that he did not watch television but sometimes read the newspaper. (Tr. 54-55.) His wife cooked, did the household chores, and took care of the children. (Tr. 54-56, 76.) Rankov stated that he could no longer help his wife with the chores but sometimes walked to the grocery store and shopped. (Tr. 56-57.)

Rankov testified that he went to Serbia in January and May 2008, staying each time for two or three weeks. (Tr. 65-66.) He went again with his family in April 2010 for two months because his father died. (Tr. 62-63.) This travel involved a seven hour flight to Germany, followed by a one and one-half hour flight to Serbia. (Tr. 63.) At the time of the hearing, Rankov's wife and children were in Serbia, and he was going to join them there for a hearing on dividing his father's property. (Tr. 63-64.) His wife and children usually went to Serbia for two months every summer without him. (Tr. 68.) When his wife was away, his friend's wife, who lived in the apartment upstairs, would cook and clean for him. (Tr. 72.)

At the time Verizon offered him a buy-out package in 2008, Rankov testified, he was having problems completing a full day of work due to panic attacks. (Tr. 43-44, 61, 70.) He also stated that while at Verizon, he never had any problems getting along with co-workers. (Tr. 75.) Rankov testified that he owned rental property in Scranton, Pennsylvania, which he visited in June 2008 with his family. (Tr. 59-61.) In March 2010, a friend drove him there to pick up rent

4

payments and to talk with law enforcement authorities regarding the fraudulent activity of someone falsely claiming to be his tenant. (Tr. 60.)

## II. Medical Evidence

### A. Prior to March 27, 2008 (Alleged Onset Date)

Dushan Kosovich, M.D., a psychiatrist, first saw Rankov on September 4, 2007. (Tr. 262.) During that initial visit, Rankov stated that his wife and children had gone to Serbia and that he had become depressed and felt lonely. (Id.) Dr. Kosovich prescribed Wellbutrin 300 mg. (Id.) On December 4, 2007, Rankov returned to Dr. Kosovich complaining of mood swings and trouble adjusting to living alone, as his family was still in Serbia. (Tr. 262.) He reported that he was taking his medication and stated that he had become "very fat" (Id.) Dr. Kosovich advised him to work as long as he could. (Id.) At a March 18, 2008 appointment, Dr. Kosovich noted that Rankov was sad, depressed and very nervous. (Tr. 262.) Rankov stated that he could not stop eating and that he had problems with his sinuses. (Id.)

### B. After March 27, 2008

On May 8, 2008, Rankov returned to Dr. Kosovich, complaining of mood swings. (Tr. 263.) He reported that he was going to Serbia. At Rankov's next visit, on August 25, 2008, Dr. Kosovich noted that Rankov was sad and had no energy, and that Rankov felt that he would not be able to work anymore. (Tr. 263.) Rankov did not see Dr. Kosovich again until January 26, 2009. At that visit, Dr. Kosovich documented that Rankov was usually sad and anxious and had mood swings, anhedonia, and insomnia. Dr. Kosovich prescribed Cymbalta. On February 19, 2009, Rankov complained to Dr. Kosovich that he was weak, depressed, and forgetful, and that he could not concentrate. Dr. Kosovich diagnosed major depressive disorder and prescribed Cymbalta. (Id.)

5

Also on February 19, 2009, Dr. Kosovich filled out a questionnaire provided by the State disability agency. (Tr. 253-61.) He noted Rankov's current symptoms as apathy, seclusiveness, and hypersomnia. (Id.) Dr. Kosovich indicated that he was treating Rankov with psychotherapy and Wellbutrin. (Tr. 254.) He stated that Rankov's fatigue was "[a]lways" present. (Tr. 255.) Rankov's speech was slow, but he had no clear-cut delusions. (Tr. 257.) His mood was sad, and his affect was depressed. (Id.) Dr. Kosovich noted vague suicidal thoughts. (Tr. 259.) Rankov had normal sensorium and orientation, low-average intellectual functioning, and short attention. (Tr. 258.) Dr. Kosovich stated that Rankov's ability to perform calculations was "ok" but that he was unable to do serial sevens. (Id.) Dr. Kosovich diagnosed major depressive disorder, hypertension, and obesity. (Tr. 253.) Dr. Kosovich stated that Rankov had poor insight and severely impaired judgment, and that he felt that he was hopeless. (Tr. 258.) Regarding activities of daily living, Dr. Kosovich noted that Rankov "[c]laims can't do anything." (Id.) To the prompt "Ability to Function in a Work Setting," Dr. Kosovich wrote "none." (Id.) He assessed that Rankov was capable of handling his own payment benefits. (Tr. 259.) He opined that Rankov's understanding and memory were limited because he was "[p]reoccupied about his sickness and future," and that Rankov's sustained concentration and persistence were very limited. (Tr. 260.) Dr. Kosovich opined further that Rankov's social interaction was limited because he was seclusive and self-conscious. (Id.)

On April 7, 2009, Robert Dickerson, M.D., performed a consultative internal medicine examination. (Tr. 266-70.) Rankov complained of depression. (Tr. 266.) He had occasional suicidal ideation, although not currently, but had never attempted suicide. He also complained of high blood pressure, which was currently asymptomatic, and of up to two headaches per week. He also complained of chest pain, but he had not had a stress test or angiogram. (Id.) Rankov

6

stated that he did not participate in child care because "he does not have the patience." (Tr. 267.) He claimed to bathe and dress himself daily. Dr. Dickerson noted that Rankov no longer had a primary care physician because he had lost his insurance. Rankov's physical exam was normal. (Tr. 267-69.) Dr. Dickerson diagnosed high blood pressure, chest pain, headaches, and depression. (Tr. 269.) He recommended stress testing and/or angiography regarding Rankov's chest pain and opined that Rankov was currently unrestricted for any physical activity. (Id.)

Arlene Broska, Ph.D., performed a consultative psychological evaluation on April 7, 2009. (Tr. 272-75.) During that evaluation, Rankov reported that he was not working due to his depression, that he saw Dr. Kosovich for treatment every two or three months, and that he had no psychiatric hospitalizations. Rankov presented two medications to Dr. Broska: a full bottle of Wellbutrin dated May 2008, and an empty bottle of Cymbalta, which Dr. Broska noted was a sample and appeared very old. Dr. Broska opined that it was unclear whether or not Rankov was currently taking any psychotropic medications, as he had stated that these bottles represented his current prescriptions that he took every day. Rankov reported waking up twice per night, increased appetite, and weight gain of fifty pounds since August 2008. He reported that, at times in the afternoon, he felt a little down, though he denied current suicidal or homicidal ideation. He stated that noise bothered him, and at times he became anxious and irritated and felt like he needed air. He reported no symptoms of panic, mania, or thought disorder. (Tr. 272-73.)

Dr. Broska's mental status examination showed that Rankov was cooperative, and that his social skills, ability to relate, and overall presentation were adequate. (Tr. 273.) Rankov was well-groomed, with normal gait, posture, and motor behavior. His eye contact was appropriate, his speech was normal, and his expressive and receptive language abilities were adequate. His thought processes were goal-directed, with no evidence of hallucinations, delusions, or paranoia.

7

His attention and concentration were intact. (Tr. 274.) Rankov could do counting, simple calculations, and serial threes. His recent and remote memory skills were intact. He could recall three out of three objects immediately and after five minutes. He could repeat five digits forward and three digits backwards. His intellectual functioning was in the average range, with his general fund of information appropriate to experience. His insight and judgment were fair. Rankov reported that was able to dress, bathe, and groom himself. He shopped on occasion and drove short distances. He spent his days watching television. Dr. Broska opined that Rankov could follow and understand simple directions and instructions and perform simple tasks independently. He was able to maintain attention and concentration and learn new tasks and could maintain a regular schedule. Dr. Broska opined that Rankov could perform complex tasks independently, make some appropriate decisions, relate adequately with others, and appropriately deal with some stress. Dr. Broska stated that her examination did not appear consistent with any psychiatric diagnosis or problem that significantly interfered with Rankov's ability to function on a daily basis. (Tr. 274-75.)

On April 21, 2009, State agency review psychiatrist, J. Belsky, M.D., completed a psychiatric review technique form. (Tr. 277-90.) Dr. Belsky found that Rankov had depression, which did not satisfy the criteria of affective disorders under Listing 12.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 280.) Dr. Belsky concluded that Rankov had moderate difficulty in maintaining social functioning and in concentration, persistence, or pace. (Tr. 287.) Rankov had no restrictions in his activities of daily living and no episodes of deterioration lasting for an extended duration. (Id.)

Dr. Belsky also provided an assessment of Rankov's mental residual functional capacity after reviewing the medical examination notes and opinions. (Tr. 297-300.) Dr. Belsky assessed

that Rankov was moderately limited in his ability to: maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting.  (Tr. 297-98.)  Rankov was not significantly limited in any other function.  Dr. Belsky concluded that Rankov's functional capacity allowed him to perform tasks in a low-stress work setting.  (Tr. 299.)

On April 30, 2009, Rankov reported to Dr. Kosovich that he was very nervous, depressed, and had gained fifty pounds.  (Tr. 305.)  Dr. Kosovich gave him a sample of Aplenzin.  (Id.)  On May 6, 2009, Dr. Kosovich noted that Rankov "claims that can't do anything because of severe depression."  (Tr. 306.)  Dr. Kosovich gave him a 100-pill sample/supply of Cymbalta.  (Id.)

At Rankov's next visit on December 18, 2009, over seven months later, Dr. Kosovich noted that Rankov had mood swings, was usually sad, and still had a depressed affect.  (Tr. 306.)  He prescribed Cymbalta.  (Id.)  On March 30, 2010, Rankov reported to Dr. Kosovich that he was doing slightly better.  (Tr. 306.)  Dr. Kosovich noted that Rankov could not do without his medications.  (Id.)  On June 7, 2010, Dr. Kosovich reported that Rankov was very weak, depressed, and had poor sleep.  (Tr. 323.)

Also on June 7, 2010, Dr. Kosovich completed a medical statement for Rankov's attorney.  (Tr. 319-21.)  He diagnosed major depressive disorder and checked off symptoms of anhedonia, appetite disturbance with change in weight, sleep disturbances, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty

9

concentrating or thinking, and thoughts of suicide. (Tr. 319.) He opined that Rankov had a marked restriction of activities of daily living; marked difficulties in maintaining social functioning; deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; and repeated episodes of deterioration or decompensation in work-like settings. (Id.) In Dr. Kosovich's assessment, Rankov was also moderately impaired in his ability to: remember locations and work-like procedures; understand, remember, and carry out simple instructions; interact appropriately with the general public; ask simple questions or request assistance; maintain socially appropriate behavior; be aware of normal hazards; and travel to unfamiliar places or use public transport. (Tr. 319-20.) Rankov was markedly impaired in his ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; make simple work-related decisions; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (Id.) Rankov was extremely impaired in his ability to: perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Id.) Dr. Kosovich commented, moreover, that Rankov was "chronically depressed and disabled." (Tr. 320.)

### C. Medical Evidence Submitted to Appeals Council

On December 21, 2010, after the ALJ rendered her decision denying benefits, Rankov submitted medical records from Serbia indicating that on November 11, 12, and 13, 2010,

Rankov visited Serbian cardiologist Dr. Danka Sutilovic, M.D. complaining of a "feeling of tension, weight on the chest" and a neuropsychiatrist, Dr. Dragan M. Pantin, M.D., who diagnosed Rankov with "anxiety disorder." (Tr. at 329, 333, 335.)

### III. Vocational Expert Testimony

Vocational expert ("VE") Jay Steinbrenner testified at the July 6, 2010 administrative hearing. (Tr. 77-94.) The Administrative Law Judge ("ALJ") presented a hypothetical of an individual with the same age (37), education (high school), and work experience as Rankov, who could perform work at all exertional levels but was limited to low stress work, e.g., work that was not fast-paced or that did not require dealing with the general public. (Tr. 79-80.) The VE testified that the individual could not perform Rankov's past work. (Tr. 81.) The VE stated, however, that the hypothetical person could perform other jobs. This individual could perform the "low semi-skilled," medium job of janitorial cleaner (Dictionary of Occupational Titles ("DOT") No. 382.664-010), which had 2,009,801 positions nationally and 43,605 regionally. (Tr. 81-82.) Rankov's past work had skills that transferred to the job of janitorial cleaner. (Tr. 82.) The hypothetical individual could also perform the unskilled, medium jobs of kitchen porter/dishwasher/cleaner (DOT No. 318.687-010), which had 424,590 positions nationally and 7,286 regionally, and commercial laundry worker II (DOT No. 361.685-018), which had 234,129 positions nationally and 4,159 regionally. (Tr. 81-83.)

Rankov's attorney posited a hypothetical to the VE of an individual who was moderately limited in the ability to maintain attention and concentration for extended periods, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, the ability to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to interact appropriately with the general public, the ability to accept

11

instructions and respond appropriately to criticism from supervisors, and the ability to respond appropriately to changes in the work setting. (Tr. 84, referring to Tr. 297-98.) The VE stated that the described limitations could pose barriers to employment in some individuals, but that the hypothetical was too general to formulate an opinion. (Tr. 91-93.) In particular, he would need to know more details concerning the "moderate limitation in completing a normal workday or work week" and "unreasonable number and length of rest periods," the two most significant limitations. (Tr. 91.)

Notably, in formulating her hypothetical, the ALJ expressly declined to pose the marked and severe limitations as stated by Dr. Kosovich, stating that if she "were to use the limitations given by Dr. Kosovich … [Rankov] would not be able to do any work that exists in the national economy." (Tr. at 79-80.) The ALJ thus conceded that if she were to give Dr. Kosovich's opinion controlling weight, it would mandate a finding that Rankov is disabled under Step 3.

## IV. Administrative Proceedings

Rankov filed an application for disability insurance benefits on January 29, 2009. (Tr. 146-52.) The application was initially denied on April 22, 2009. (Tr. 98-101.) Rankov timely requested a hearing, which was held on July 6, 2010, before Administrative Law Judge ("ALJ") Hazel C. Strauss. (Tr. 37-96.) Rankov appeared with his attorney, who had been retained since April 28, 2009. (Tr. 102.) On October 26, 2010, the ALJ found that Rankov was not disabled. (Tr. 16-36.) Rankov sought review of the ALJ decision by the Appeals Council. (Tr. 12-13.) On April 29, 2011, the Appeals Council denied his request for review, making ALJ Strauss' order the final decision of the Commissioner. (Tr. 1-6.) Rankov filed this action on May 26, 2011.

**DISCUSSION**

Under § 205(g) of the Social Security Act ("SSA"), the Commissioner's conclusions must be affirmed unless they are not "supported by evidence in the record as a whole or are based on an erroneous legal standard." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (internal quotation marks and citation omitted); accord Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("In reviewing the Commissioner's denial of benefits, the courts are to uphold the decision unless it is not supported by substantial evidence or is based on an error of law."). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks omitted).

## I. Evaluating Disability Under the Social Security Act

Under the SSA, an individual is under a disability if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be eligible for disability insurance benefits, a claimant must establish that he became disabled while he had insured status. 42 U.S.C. §§ 423(a)(1)(A), 423(c); see Arnone v. Bowen, 882 F.2d 34, 37-38 (2d Cir. 1989). It is undisputed that Rankov meets the insured status requirement through December 31, 2012. (Tr. 21.)

The Commissioner uses a five-step analysis to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. § 404.1520. The Commissioner first determines whether the claimant is working; if he is engaging in substantial gainful activity, the claim will be denied without consideration of any medical evidence. 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b). If the claimant is not working, the Commissioner determines whether the claimant has a severe impairment that significantly limits her physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 404.1521. If the claimant is found to have such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment or combination of impairments that meets or equals one of the listings in Appendix 1 to 20 C.F.R. Part 404, Subpart P of the Regulations; if so, the claimant will be found disabled with no further inquiry. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 404.1525, 404.1526.

If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity ("RFC") to perform her past work. 20 C.F.R. §§404.1520(a)(4)(iv), 404.1520(f), 404.1560(b). To determine the claimant's RFC, the Commissioner must consider all the claimant's impairments, not just those deemed severe. 20 C.F.R. §§ 404.1520(e), 404.1545(a); Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P, 1996 WL 374184 (July 2, 1996). If the Commissioner finds that her RFC is sufficient for the claimant to perform past relevant work, the claimant will be found not disabled and her claim denied.

If the claimant's RFC does not permit her to engage in his prior work, or if the claimant does not have any past relevant work, the fifth and final step requires the Commissioner to determine whether the claimant, in light of her RFC, age, education, and work experience, has

the capacity to perform "alternative occupations available in the national economy." Decker v. Harris, 647 F.2d 291, 298 (2d Cir. 1981); see 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g). The burden falls on the Commissioner to establish that there is gainful work in the national economy that the claimant could perform. See Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004). If no such gainful work in the national economy exists, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v).

## II. The ALJ's Decision

Applying the above five-step analysis to this case, the ALJ concluded that Rankov was not disabled within the meaning of the SSA. The ALJ concluded at Step Two that Rankov's major depressive disorder did "not cause more than minimal limitation in [his] ability to perform basic work activities," but assumed arguendo that it was a severe impairment in order to continue the sequential evaluation. (Tr. 21.) At Step Three, the ALJ concluded that Rankov's mental impairment did not meet the criteria of listing 12.04 in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 22.) At Step 4, the ALJ determined that, even assuming that Rankov exhibited the nonexertional limitation of being restricted to low-stress type work, e.g., not fast-paced or dealing with the broad general public, Rankov retained the RFC to perform the full range of work at all exertional levels. (Tr. 24.) Based on this RFC, the ALJ found at Step 5 that although Rankov could not perform his past relevant work, he could perform other jobs that exist in significant numbers in the national economy and so was not disabled. (Tr. 24-33.)

## III. The ALJ Failed to Properly Apply the Treating Physician Rule

During the hearing the ALJ acknowledged that if she were to accept the findings of Dr. Kosovich regarding Rankov's limitations, she would have had to find that Rankov was disabled because he would meet the severity of a listed impairment and/or because he would not retain the

15

RFC to perform work that existed in the national economy. (Tr. 79-80, 83.) Accordingly, Rankov's central objection to the ALJ's opinion is her failure to accord much weight to Dr. Kosovich's submissions. (See Rankov Mem. at 11-13.)

It is well-settled that "[t]he opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record." Selian, 708 F.3d at 418; see also 20 C.F.R. § 404.1527(c)(2). This so-called "treating physician rule" is even "more relevant in the context of mental disabilities, which by their nature are best diagnosed over time." Lopez-Tiru v. Astrue, No. 09-cv-1638 (ARR), 2011 WL 1748515, at *4 (E.D.N.Y. May 5, 2011) (internal quotation marks omitted). Although consultative physician opinions can be substantial evidence, see Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2994), if only one consultant disagrees with a treating physician whose opinion is otherwise supported by substantial evidence, the treating physician's opinion should be given controlling weight. See Vernon v. Astrue, No. 06-cv-13132 (RMB) (DF), 2008 WL 5170392, at *23 (S.D.N.Y. Dec. 9, 2008). Moreover, the Second Circuit has recently cautioned that "ALJs should not rely heavily on the findings of consultative physicians after a single examination." Selian, 708 F.3d 419.

If a treating source is not given controlling weight, "the Commissioner must 'give good reasons in his notice of determination or decision for the weight he gives [the claimant's] treating source's opinion.'" Botta v. Barnhart, 475 F. Supp. 2d 174, 187 (E.D.N.Y. 2007) (quoting Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998)). Failure to give good reasons is a ground for remand. See Halloran, 362 F. 3d at 33; Botta, 475 F. Supp. 2d at 187 (citing Schaal, 134 F.3d at 503-04); cf. Rodriguez v. Barnhart, No. 04 Civ. 949, 2004 WL 2997876, at *9 (S.D.N.Y. Dec. 28, 2004) ("The failure to follow the procedure set forth in the regulations

16

constitutes legal error and is grounds for a remand."). The ALJ is directed to consider the:

> [l]ength of the treatment relationship and the frequency of examination; the [n]ature and extent of the treatment relationship; the relevant evidence . . . , particularly medical signs and laboratory findings, supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues.

Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(c)(2)(i)(ii), (c)(3)-(5)) (internal quotation marks omitted).

Because an ALJ has an affirmative obligation to develop the administrative record, she cannot reject a treating physician's diagnosis without first attempting to "fill any clear gaps in the administrative record." Burgess, 537 F.3d at 128; see also, Selian, 708 F.3d at 419-20 & n. 4 (the ALJ's failure to make any effort to reconcile apparent inconsistencies in the record was grounds for remand); Cabassa v. Astrue, No. 11-cv-1449 (KAM), 2012 WL 2202951, at *7-8 (E.D.N.Y. Jun. 13, 2012) ("An ALJ's failure to reconcile materially divergent RFC opinions of medical sources is also a ground for remand."). The duty to develop the record requires the ALJ to affirmatively seek out clarifying information, "which may include seeking additional medical records or [the treating physician's] testimony as to the bases for his conclusions." Cabassa, 2012 WL 2202951 at *10-11. For this reason, a treating physician's failure to offer clinical findings to substantiate his opinion is not "good reason" for rejecting the opinion. Schaal, 134 F.3d at 505 (even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*").

Here, the ALJ erred in declining to accord controlling weight to the opinion of Dr. Kosovich without adequately attempting to develop the record. The primary reasons cited by the ALJ for refusing to defer to Dr. Kosovich's opinion are that his treatment notes were cursory, that the reports submitted to the SSA largely contained answers of only a few words or check

17

marks next to pre-formulated prompts, and that Dr. Kosovich's conclusions relied heavily on Rankov's own accounts of his symptoms rather than clinical findings. These fail to constitute "good reasons" for rejecting the opinion of Rankov's long-term treating psychiatrist. The ALJ had an affirmative obligation to first follow-up with Dr. Kosovich to resolve any perceived insufficiencies, ambiguities or inconsistencies in his reports and treatment notes before refusing to give his opinion controlling weight. Cf. Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998) ("[The treating physician's] failure to include [clinical] support for the findings in his report does not mean that such support does not exist; he might not have provided this information in the report because he did not know that the ALJ would consider it critical to the disposition of the case."). Moreover, the ALJ should not have discounted Dr. Kosovich's opinion merely because it reported the subjective complaints raised by Rankov. A physician's reliance on the plaintiff's "subjective complaints hardly undermines his opinion as to [his] functional limitations, as a patient's report of complaints, or history, is an essential diagnostic tool." See Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003) (internal quotation marks omitted); see also Lopez-Tiru, 2011 WL 1748515 at *4 (ALJ's rejection of treating psychiatrist's opinion because it was "based on subjective complaints" and "not supported by clinical findings" not good reasons to reject his opinion); Polis v. Astrue, No. 09-cv-379 (FB), 2010 WL 2772505, at *10 (E.D.N.Y. Jul. 13, 2010) ("Quite frankly, the Court is unaware of what a psychiatrist is expected to do… other than to review the patient's history, conduct a mental status examination and to report the results and recommendations regarding the patient's ability to function." (quotation marks and citation omitted)). And there is at least some suggestion in Dr. Kosovich's February 19, 2009 disability report that he based his conclusions regarding Rankov's comprehension, concentration, and memory skills on objective clinical

testing: Dr. Kosovich indicated, in response to the form's questionnaire, that Rankov was unable to recite serial sevens and that his ability to perform calculations was merely "ok." (Tr. 258.) In any event, to the extent she was concerned that his medical opinion lacked proper clinical foundation, the ALJ was again obligated to follow-up with Dr. Kosovich before discounting his opinion. Schaal, 134 F.3d at 505; Lopez-Tiru, 2011 WL 1748515 at *4.

The Court therefore agrees with Rankov that the ALJ failed to properly consider Dr. Kosovich's opinion. As a result, the hypothetical posed to the VE—to the extent it was even necessary—may not have accurately reflected the extent of Rankov's psychiatric limitations. Because it is for the Social Security Administration, not this Court, to weigh conflicting evidence in the first instance and to fully develop the administrative record, the Court finds that remand for further administrative proceedings is warranted. Accordingly, the parties' cross-motions for judgment on the pleadings are denied. On remand, the ALJ should develop the record to satisfy any outstanding concerns about Dr. Kosovich's findings, and reconsider whether plaintiff's psychiatric impairments satisfy the criteria of affective disorders under Listing 12.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1. If the ALJ determines that Rankov does not have a listed mental impairment, she is directed to reconsider whether he nonetheless does not retain an RFC to perform work in the national economy. The ALJ is directed to consider all of the evidence in the record, including the evidence submitted to the Appeals Council after the ALJ's opinion was issued and any other evidence submitted by the parties or developed by the ALJ on remand. Should the ALJ determine that Dr. Kosovich's opinion does not deserve controlling weight, she must provide a comprehensive statement indicating what weight was given, expressly considering such factors as the nature and frequency of treatment, the amount of medical evidence supporting the opinion, the consistency of the opinion with other medical

evidence, and Dr. Kosovich's specialty.  Selian, 708 F.3d at 418.

## CONCLUSION

For the above reasons, both parties' motions for judgment on the pleadings are denied. ALJ Strauss' decision is vacated and the case is remanded for further administrative proceedings pursuant to 42 U.S.C. § 405(g).  The Clerk of the Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
       March  30, 2013

                                            /s/
                                   Carol Bagley Amon
                                   Chief United States District Judge